## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                          )
CAIUS VEIOVIS,                            )
                                          )
        Petitioner,                       )
                                          )
v.                                        )          Civil Action No. 4:18-cv-11632-TSH
                                          )
SUPERINTENDENT                            )
COLETTE GOGUEN,                           )
                                          )
        Respondent.                       )
                                          )
_____)

### RESPONDENT'S MEMORANDUM IN OPPOSITION TO PETITION

The respondent hereby files this memorandum of law in opposition to the habeas corpus petition filed by the petitioner, Caius Veiovis, an inmate at the North Central Correctional Institution in Gardner, Massachusetts.  The petitioner challenges his convictions in a Massachusetts state court of three counts each of first-degree murder on a theory of deliberate premeditation, of kidnapping and of intimidation of a witness.  A jury convicted the petitioner after hearing evidence that he participated in the kidnapping and killing of David Glasser, Edward Frampton and Robert Chadwell of Pittsfield in August of 2011, in an effort to prevent Glasser from testifying at the upcoming trial of a co-venturer, Adam Hall.

The petitioner's single habeus claim – that there was insufficient evidence to support the convictions - was rejected by the Massachusetts Supreme Judicial Court ("SJC") in a thorough opinion.  The SJC's adjudication of that claim neither was contrary to nor involved an unreasonable application of clearly established United States Supreme Court precedent.

Accordingly, the claim provides no valid basis for habeas corpus relief, and the petition should

be denied in its entirety

## I.      <u>BACKGROUND</u>

### A.      <u>The Kidnappings and Murders</u>

This factual recitation is taken from the SJC's decision.  Facts stated by the SJC or

otherwise found by state courts are entitled to the statutory presumption of correctness described

<u>infra</u>, Section II.A.1.  <u>See</u> 28 U.S.C. § 2254(e)(1).

The SJC stated as follows:

The circumstances leading up to the killings began in July, 2009, when Hall beat
Glasser with a baseball bat because he believed that Glasser had stolen and sold
motor vehicle parts that belonged to Hall. While Glasser was being interviewed
by a State police trooper two days later, Hall threatened Glasser in a telephone
call. The State police arrested Hall that day and recovered a baseball bat from
Hall's vehicle.

In July, 2010, while the charge against Hall of assault and battery by means of a
dangerous weapon was pending, Hall concocted a scheme to discredit Glasser by
framing him on a false kidnapping charge. As part of this scheme, a friend of
Hall, Nicole Brooks, falsely reported to the police that Glasser kidnapped her and
shot at her when she escaped; another friend of Hall, Scott Langdon, planted
Brooks's wallet and a revolver in Glasser's truck, where they were found by police
during a search of the truck. The scheme resulted in Glasser's arrest, but the police
soon exonerated Glasser and brought criminal charges against Hall and those who
participated with him in the scheme.

The [petitioner] began spending time with Hall and [David] Chalue in the latter
half of August, 2011. Hall was a "sergeant [at] arms" in a local chapter of the
Hells Angels motorcycle club and was described as an "enforcer." The
[petitioner] was not a member of the Hells Angels, but there was evidence that he
wanted to be. He began to wear a vest with a Hells Angels insignia on the front
and kept a Hells Angels sticker in his Jeep and apartment. Hall told a witness in
the [petitioner]'s presence of the possibility that the [petitioner] would get a
motorcycle and become a prospective member of the Hells Angels. The
[petitioner]'s employer told the police that the [petitioner] had wanted to establish
credit because he wanted to buy a motorcycle and that "you cannot be in the Hells
Angels without buying the motorcycle."

The time line of events before and after the killings is important in evaluating the

weight of the evidence implicating the [petitioner] as a participant in the killings. On Friday, August 26, 2011, Hall picked up a friend, Katelyn Carmin, in the tan Buick vehicle [FN 3] he had purchased earlier that month; the [petitioner] and Chalue were with him. While driving around to various bars, Hall went into a tirade about a person he called "Drummer Dave," [FN4] who he said had robbed him and then "snitched" on him. Hall said he was "going to kill that motherfucker." The [petitioner], along with Chalue, responded to Hall by assuring him that Hall will "get him." Later that evening, they drove to the Hells Angels clubhouse in Lee, where they rode in an all-terrain vehicle. Hall told Carmin to be careful because he needed the [petitioner] and Chalue for "a job."

> [FN3] The Buick at other times during the trial was described as gold in color.

> [FN4] Andrew Johnston, a childhood friend of Robert Chadwell, testified that people often referred to David Glasser by his nickname, "Drummer Dave."

On Saturday, Hall was seen outside the building where the [petitioner]'s girl friend resided, talking to the [petitioner] while sitting in the girl friend's pickup truck. In the early afternoon, Hall, Chalue, and the [petitioner] went to a party held by the Springfield chapter of the Hells Angels at a tavern in Springfield; Hall and the [petitioner] left the party together in the afternoon and returned at approximately 4:30 P.M. Hall, Chalue, and the [petitioner] left the tavern together at approximately 6:30 P.M., and drove away in Hall's Buick. Later that evening, Hall, Chalue, and the [petitioner] were at the Hells Angels clubhouse in Lee; they left later to go to the [petitioner]'s house in Pittsfield. Hall drove to the [petitioner]'s home in his own vehicle but first stopped at Steven Hinman's home in Lenox. Hall showed Hinman a .45 semiautomatic pistol that he had in his vest, as well as a "dog food bag" that contained a .44 Magnum revolver, a sawed-off AR-15-type weapon, and a small revolver.

The [petitioner] and Chalue traveled to the [petitioner]'s home with two women, Allyson Scace and Kayla Sewall, in Sewall's vehicle after stopping at a liquor store. When Hall arrived at the [petitioner]'s home, he pulled the firearms out of the dog food bag and asked the [petitioner] where he kept brake cleaner and gloves. The [petitioner] directed him to a cabinet and went upstairs with Sewall. While they were upstairs, Hall and Chalue disassembled and cleaned the firearms. The [petitioner] asked Sewall to stay, but she declined and left with Scace at approximately 9 P.M., leaving Hall, Chalue, and the [petitioner] alone in the apartment.

The kidnapping of the three victims in Glasser's apartment in Pittsfield occurred shortly before midnight that Saturday or early Sunday morning. Glasser's upstairs neighbor asked Glasser to move his truck at approximately 10:30 P.M. that Saturday, and saw the three victims (and a fourth man) in the kitchen of Glasser's

apartment at that time. The last telephone call made from Chadwell's cellular telephone was at 11:21 P.M. Shortly after midnight, the upstairs neighbor heard banging from the front downstairs hallway, and heard the voices of Glasser and Frampton, as well as some unfamiliar voices. Hall later told a friend, Rose Dawson, that, when they arrived at Glasser's apartment, one of the victims was using a computer and another was playing a video game.

The [petitioner]'s girl friend had returned from a hiking trip on Friday night and was at her home on Saturday night. She made a telephone call to the [petitioner]'s cellular telephone at 12:09 A.M. on Sunday, but the [petitioner] did not answer and she left a voicemail message. She sent him a text message on his cellular telephone at 1:20 A.M., but received no reply. She telephoned him again at 1:40 A.M., and again left a voicemail message after the call was not answered. At approximately 1:30 A.M. on Sunday, Hall appeared at Dawson's home in Pittsfield. He asked to borrow Dawson's cellular telephone, which she gave to him; he said he would be back soon. He entered the passenger seat of a vehicle described as a Jeep Wrangler [FN 5] and left; the [petitioner] owned a Jeep Wrangler.

> [FN5] There was some confusion as to the color of the vehicle that was at Rose Dawson's residence at 1:30 A.M. Edwin Sutton, Rose's father described it as a Jeep Wrangler and testified that, although he was not sure, he thought it might have been yellow. Ocean Sutton, one of Edwin's daughters, described it as a green Jeep Wrangler. The defendant's Jeep is black.

Hall was next seen at a convenience store in Pittsfield at approximately 5:30 A.M., where he purchased three candy bars and a pack of cigarettes. Hall returned a few minutes later and purchased a pack of Black and Mild cigars. The police seized the [petitioner]'s Jeep seven days later and subsequently searched it; they found a Black and Mild cigar wrapper inside. On September 12, in a search of the [petitioner]'s apartment, to which he had recently moved, the police found four or five Black and Mild cigar wrappers in a duffle bag.

The store clerk observed that Hall had mud on his shirt and that his boots and blue jeans were wet, as was the cash he handed over to pay for the items. Tropical Storm Irene had reached western Massachusetts during the night, bringing heavy rain and high winds for much of the night and into the morning.

Shortly thereafter, Hall returned to the Dawson residence and parked his Buick on the front lawn. The [petitioner]'s Jeep arrived behind the Buick. Hall walked from the Buick to the Jeep and left in the Jeep.

At approximately 10:30 A.M., Hall returned to the Dawson residence with Chalue and the [petitioner] in the [petitioner]'s Jeep, which Hall was driving. Hall, who

4

was wet and not wearing shoes, asked Dawson and her friend, Alexandra Ely, who was staying overnight with Dawson, to come to Hall's home to make breakfast. Hall gave them money, which was soaking wet, and told them to buy breakfast food and bleach; he also told them to wash their hands after handling the money. As Dawson and Ely drove to a supermarket in Hall's Buick, Hall telephoned Ely and told her to skip the bleach and not look in a bag in the vehicle. They looked inside the bag and saw what looked like a "batting glove or golf glove."

When they arrived at Hall's house, the [petitioner]'s Jeep was parked in front; Hall, Chalue, and the [petitioner] were inside. Hall returned Dawson's cellular telephone to her and told her to delete her call log and tell no one that he had borrowed it. Chalue was in bed, and the [petitioner] sat in a recliner "sleeping" and looking "tired." Dawson and Ely left later in Hall's Buick to return home. Hall, Chalue, and the [petitioner] retrieved the Buick from Dawson's home later that day.

At approximately 2 P.M., Hall arrived at the home of David Casey in Canaan, New York, approximately eighteen miles from Pittsfield, in the Buick. Hall said that he was having trouble with his vehicle and asked Casey if he knew anywhere nearby where he could park it overnight. Casey called a friend, Alan Pavoni, who agreed to let Hall park the vehicle in Pavoni's driveway in Becket. Hall then told Casey that he had killed Glasser, as well as "a fat guy" and a black man who were with Glasser. He explained that he had held Glasser down and pulled the trigger, but the gun misfired. As he tried to rechamber another round, Glasser ran into the woods. "Davey" ran after him and shot him, but did not kill him. "Davey" brought Glasser back to Hall, who then shot him. Hall said the other two men were stabbed to death. He said they thought the black man was dead and left him but, when they came back, they saw him sitting on a log, moaning. Hall also said that they "chopped [the victims] up," and added that "one of the guys really enjoyed torturing and cutting them up." Hall noted that it was "raining very hard" while this was happening.

Hall asked if Casey was still working with an excavator at a property in Becket, and Casey said that he was. Hall then asked if Casey would do him a favor; he wanted Casey to dig a hole to bury the bodies. Hall added that, if Casey did this favor for him, he would not harm Langdon. [FN 6] Hall wanted to go with him to dig the hole that day, but Casey said he would meet him there on Monday morning.

> [FN6] David Casey testified that Scott Langdon was living with and planned to marry Casey's sister. Casey knew that Langdon was cooperating with the police regarding the pending charges against Hall.

Between 5 and 6 P.M., Hall drove his Buick to Pavoni's property and parked it

there; another person was with him in the Buick. A "Jeep-like vehicle" also arrived and picked up Hall.

Hall, Chalue, and the [petitioner] were seen late in the afternoon standing near the [petitioner]'s Jeep in the parking lot of the apartment building in Pittsfield where the [petitioner]'s girl friend resided.

Casey met Hall as scheduled at approximately 8:30 A.M. on Monday at Pavoni's property. [FN 7] Hall was with a man he identified as "Davey," whom Hall assured Casey he could trust because the man was a member of the Aryan Brotherhood, and a person had to kill someone to become a member; Casey identified this man at trial as Chalue. Hall opened the trunk of the Buick and said that it was "starting to smell." Hall later drove the Buick to the property where Casey kept the excavator. Casey used the excavator to dig a large hole, and Hall opened the trunk and dropped a number of plastic garbage bags, which Hall said contained body parts, into the hole.

>    [FN7] The [petitioner] arrived for work as usual on Monday morning at
>    the design firm where he was employed as a gardener.

On Monday afternoon, Hall and Chalue brought the Buick to a salvage yard and sold it for scrap, where it was later placed in a crusher. The interior carpets were coated with liquid, the back seat was mostly missing, and the carpet had been removed from the trunk. On Sunday, September 4, Hall, Chalue, and the [petitioner] drove past the salvage yard in the [petitioner]'s Jeep, and then drove back in the other direction, arguably for the purpose of checking to see that Hall's Buick had actually been crushed. After they were stopped by police at a nearby gasoline station, the police seized and searched the Jeep, but found nothing of evidentiary value.

On Friday, September 9, after Casey had revealed to police the location of the bodies, the police dug up the plastic bags containing the victims' body parts. The autopsy of the body parts revealed that all of the victims had been shot and stabbed; their neck, arms, and legs had been removed, and two of the bodies had been cut through the torso. Most of the dismemberment had been accomplished by chopping or hacking with a sharp instrument such as a butcher knife.

On September 10, the [petitioner] was arrested and brought to the Pittsfield police station. At the station, a State police lieutenant told the [petitioner] that he was protecting a "rat," referring to Hall, because Hall had offered to cooperate with the Federal Bureau of Investigation regarding the Hells Angels clubhouse in Lee a year earlier. As the [petitioner] was walking back to his cell, the [petitioner] said to Chalue, "[Y]ou hear what they're saying about our partner? They're saying he's a stoolie."

On September 12, the police executed search warrants at two apartments in the

same building in Pittsfield: an apartment where the [petitioner] lived and an apartment from which he had recently moved.  In the apartment where he lived, among other items that will be described later in this opinion, the police found a September 6 edition of a newspaper with an article describing the disappearance of the three victims, and an article dated September 8, describing the search for the missing men.

Commonwealth v. Veiovis, 477 Mass. 472, 474-479 (2017) (Gants, C.J.).

### B.      The State-Court Proceedings

On October 6, 2011, a Berkshire County, Massachusetts, grand jury indicted the petitioner on three counts each of murder, kidnapping and intimidation of a witness arising from the events described above.  SA Ex.1/1-5,7.[1]  The petitioner was tried before the Honorable Jeffrey Kinder and a jury beginning on September 5, 2014.  Id. at 6, 14-16.  After twelve days of trial and six days of deliberation, the jury found the petitioner guilty of all charges.  Id. at 14-16. On September 29, 2014, Justice Kinder, as required by state law, sentenced him to life in prison without possibility of parole.  Id. at 16; M.G.L. c. 265, § 2(a).  That same day, the petitioner filed a notice of appeal.  SA Ex. 1/16.

The SJC entered the petitioner's appeal on its docket on December 15, 2015.[2]  SA Ex.2/1. On July 19, 2017, the SJC affirmed his convictions.  Veiovis, 477 Mass. at 474.  The SJC rejected, inter alia, the petitioner's claim that the evidence in support of his convictions was

---

[1] The supplemental answer filed by the respondent on September 15, 2020, is referred to as SA [exhibit number]/[page].  Other documents filed in this Court are referred to by docket number as Doc. No. __.

[2] Appeals from first-degree murder convictions in Massachusetts are heard directly by the SJC in the first instance.  See M.G.L. c. 211A, § 10 (carving out exception for first-degree murder cases in establishing appellate jurisdiction of Massachusetts Appeals Court).  In such instances "the entry in the [SJC] shall transfer to that court the whole case for its consideration of the law and the evidence.  Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence." M.G.L. c. 278, § 33E.

insufficient. Id. at 479-481.  The Court also concluded that the verdicts of murder in the first

degree are fully consonant with justice and declined to exercise its authority under [M.]G.L. c.

278, § 33E." Veiovis, 477 Mass. at 489-490.

The respondent provides additional facts regarding the trial and the SJC's decision in the

relevant sections of the Argument below.

### C.   The Petitioner's Habeas Corpus Action

The petitioner commenced the instant habeas corpus action on August 2, 2018.  Doc. No.

1.  In his petition, he asserted a single claim for relief: that his "[c]onviction violated [his] right

to due process where the evidence was legally insufficient to support the verdict[s] of guilty.  Id.

at 5.  As supporting facts he stated:

> No witness identified the petitioner as a participant in the charged offenses.  No
> circumstantial or forensic evidence linked him to the crimes.  The verdict was based
> entirely on speculation that fell short of establishing his guilt on the charged offenses.

Id.  The petitioner filed a memorandum in support of the claim in his petition on

November 15, 2020. Id.

The respondent now files this memorandum in opposition to the petition.

## II.   ARGUMENT

### A.   Certain Well-Established, General Standards Must Be Applied in Assessing the Petitioner's Entitlement to Relief.

As this Court considers the petitioner's claims for habeas corpus relief, it should be

guided by certain familiar legal doctrines.

#### 1.   State-court factual determinations, including implicit findings, are entitled to a presumption of correctness that the petitioner cannot overcome without clear and convincing evidence.

As referenced above, in this "proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  For this purpose, "the term 'facts' refers to 'basic, primary, or historical facts,'" such as witness credibility and recitals of external events."  Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007) (quoting Sanna v. DiPaolo, 265 F.3d 1, 7 (1st Cir. 2001)).

The statutory presumption extends to "findings [that] are made by a state appellate court as well as [those that] are made by a state trial court."  RaShad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002); see Pina v. Maloney, 565 F.3d 48, 50 (1st Cir. 2009) ("'We take the facts as recounted by the [SJC] decision affirming [the petitioner's] conviction, supplemented with other record facts consistent with the SJC's findings.'" (quoting Yeboah-Sefah v. Ficco, 556 F.3d 53, 62 (1st Cir. 2009)).  It also applies to findings that are not expressly articulated but are implicit in court determinations.  See, e.g., Teti v. Bender, 507 F.3d 50, 59 (1st Cir. 2007) (stating that the state court's "implicit credibility determinations . . . are exactly the type of factual determinations to which we defer, at least short of any indication of serious error"); Valdez v. Cockrell, 274 F.3d 941, 948 & n.11 (5th Cir. 2001) (stating in part that "[t]he presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."); Weeks v. Snyder, 219 F.3d 245, 249 (3d Cir. 2000) (affirming that "implicit factual finding" regarding credibility is due the deference called for by § 2254(e)); cf. Marshall v. Lonberger, 459 U.S. 422, 433-34 (1983) (finding presumption contained in prior version of § 2254 applicable to credibility determination that could be inferred from state-court ruling).

###### 2.   The petitioner cannot prevail on a claim decided at the state level without overcoming a deferential standard.

The circumstances in which federal habeas corpus relief may be awarded to a state

prisoner like the petitioner are narrowly limited.  Congress has provided as follows:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> . . .
>
> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254; see 28 U.S.C. § 2241(c) (providing in pertinent part that "[t]he writ of habeas

corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution

or laws or treaties of the United States").

As the Supreme Court has affirmed, "[w]hen a federal claim has been presented to a state

court and the state court has denied relief, it may be presumed that the state court adjudicated the

claim on the merits in the absence of any indication or state-law procedural principles to the

contrary."  Harrington v. Richter, 562 U.S. 86, 99 (2011) (noting that "[t]he presumption may be

overcome when there is reason to think some other explanation for the state court's decision is

more likely"); see Clements v. Clarke, 592 F.3d 45, 52-56 (1st Cir. 2010) ("A matter is

'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with res

judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'" (quoting Teti, 507 F.3d at 56-57)).  "[A] state court need not cite or even be aware of [the Supreme Court's] cases under § 2254(d)" for the subsection's provisions to apply. Richter, 562 U.S. at 98.[3]

As used in subsection (d)(1) of § 2254, "the phrase 'clearly established federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta of [the Court's] decisions."  Williams v. Taylor, 529 U.S. 362, 412 (2000) (quoting § 2254(d)(1)).  A state court's decision is "contrary to" clearly established federal law only where "the state court applies a rule that contradicts the governing law set forth in" Supreme Court precedent or "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent."  Id. at 405-06; see Sleeper, 510 F.3d at 37-38 (making clear that state court contradicts Supreme Court precedent where it "arrives at a conclusion opposite from that reached by the U.S. Supreme Court on a question of law").  A state court unreasonably applies clearly established Supreme Court precedent "if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  White v.

_____

[3] See, e.g., Early v. Packer, 537 U.S. 3, 8 (2002) (concluding that review under standard in § 2254(d) was warranted where petitioner's jury-coercion claim was "the same claim rejected on the merits in his direct appeal to the state appellate court," even though state court did not cite any federal law), rev'g Packer v. Hill, 291 F.3d 569, 578-79 & n.11 (9th Cir. 2002) (stating that "the state court failed even to consider whether a federal constitutional violation occurred, as the petitioner had urged; instead it addressed only issues of state law"); Clements, 592 F.3d at 52-56 ("The real question is not whether the state court opinion cited to any federal cases, but whether the opinion addresses a fairly raised federal issue; Zuluaga v. Spencer, 585 F.3d 27, 29-32 (1st Cir. 2009) (indicating, where pertinent part of state-court decision included no citations to federal or state cases, but addressed the principle upon which the relevant issue turns under both federal and state law, that "it would elevate form over substance to impose some sort of requirement that busy state judges provide case citations to federal law (or corresponding state law) before federal courts will give deference to state court reasoning").

Woodall, 572 U.S. 415, 426 (2014).  A state court does not, however, unreasonably apply clearly established Supreme Court precedent by simply failing to extend that precedent to some new area.  Id.  Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004); accord Richter, 562 U.S. at 101.

Ultimately, a state-court decision will not be found to "involve an unreasonable application" of Supreme Court precedent unless it was objectively "more than merely erroneous or incorrect." Sleeper, 510 F.3d at 37-38.  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Richter, 562 U.S. at 102.  The "prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." Id. at 103; see id. at 102 ("Section 2254(d) preserves authority to issue the writ in cases where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no further.").  "[S]o long as 'fair minded jurists could disagree' on the correctness of the state court's decision," "[a] state court's determination that a claim lacks merit precludes federal habeas relief." Id. at 101 (quoting Yarborough, 541 U.S. at 664).

The petitioner has the burden of demonstrating that the above criteria for relief are satisfied.  See, e.g., Richter, 562 U.S. at 98 (referring to "the habeas petitioner's burden . . . [of] showing there was no reasonable basis for the state court to deny relief"); Garlotte v. Fordice, 515 U.S. 39, 46 (1995) (recognizing that "the habeas petitioner generally bears the burden of proof"); Healy v. Spencer, 453 F.3d 21, 29 (1st Cir. 2006) (referring to the "question of whether

the petitioner met his burden to show that [the state court's] conclusion was objectively

unreasonable" in appeal from allowance of claim as to which standards of § 2254(d) applied).

### B.   The Petitioner Is Not Entitled to Relief on Any of His Claims.

The petitioner is not entitled to habeas relief based on the claim in his petition.  The SJC

denied the claim on its merits.  Accordingly, that claim must be evaluated based on the standards

of 28 U.S.C. § 2254(d)(1), as described supra Section II.A.2.  And as to that claim, the SJC's

decision neither was contrary to nor involved an unreasonable application of clearly established

Supreme Court holdings.  It follows that the petition should be denied in its entirety.

### 1.   The SJC Reasonably and correctly rejected the petitioner's claim of insufficient evidence

The petitioner is not entitled to relief based on his claim that "the Commonwealth failed

to prove [his] guilt beyond a reasonable doubt."  See Petitioner's Memorandum of Law in

Support of His Petition. Doc. No. 22 at 36-44.  The SJC disagreed with the petitioner's claim of

insufficient evidence, and its conclusion was not contrary to or an unreasonable application of

clearly established federal law.  See Veiovis, 477 Mass. at 479-481.

### a.   The SJC's Decision

The SJC addressed the petitioner's claim in the following manner:

> In reviewing a claim of insufficiency of the evidence, we determine whether,
> "after viewing the evidence in the light most favorable to the prosecution, *any*
> rational trier of fact could have found the essential elements of the crime beyond a
> reasonable doubt" (emphasis in original). Commonwealth v. St. Hilaire, 470
> Mass. 338, 343 (2015), quoting Commonwealth v. Latimore, 378 Mass. 671, 677
> (1979). The [petitioner] notes accurately that there was no percipient witness who
> testified to the [petitioner]'s participation in the killing and dismemberment of the
> three victims, and no forensic evidence that linked him to the crimes.
> Circumstantial evidence, however, "alone may be sufficient to meet the burden of
> establishing guilt." Commonwealth v. Woods, 466 Mass. 707, 713, cert. denied,
> 134 S. Ct. 2855 (2014). We conclude that the evidence was sufficient in this case
> to support a finding beyond a reasonable doubt that the [petitioner], with the
> intent to kill, knowingly participated in the premeditated murder of the three

victims. See Commonwealth v. Zanetti, 454 Mass. 449, 467 (2009).

A reasonable jury could have found that the [petitioner] was aware on the Friday before the killings that Hall planned to kill Glasser in order to silence him as a witness. They also could find that the [petitioner] had a motive to assist Hall in killing Glasser, because he wanted to be a member of the Hells Angels chapter where Hall served as sergeant at arms, and helping Hall in the killing would curry favor with Hall and cause Hall to believe him worthy of trust.

On Saturday evening, shortly before the victims were kidnapped and killed, the [petitioner] was with Hall and Chalue at the [petitioner]'s home when they disassembled and cleaned multiple firearms that Hall had just brought. At approximately the time of the kidnappings and killings, the [petitioner] failed to answer two telephone calls and a text message from his girl friend. As described by Hall in his conversation with Casey, Hall, Chalue, and a third assailant brought the victims to the woods in the heavy downpour of the tropical storm, killed them, and dismembered their bodies. [FN 8] It can reasonably be inferred that the dismemberment of the victims took a substantial period of time to accomplish and that it would have been bloody and messy work in a tropical storm. It is therefore probative that Hall was a passenger in what reasonably could be inferred to be the [petitioner]'s Jeep at approximately 1:30 A.M., when Hall stopped at the Dawson residence. It can also reasonably be inferred that Chalue and the [petitioner] were still with Hall at approximately 5:30 A.M., because Hall purchased three candy bars at the convenience store and a brand of cigars smoked by the [petitioner]. This inference grows stronger when one considers that the [petitioner]'s Jeep followed Hall when he dropped the Buick off at the Dawson residence shortly after leaving the convenience store, and that Hall immediately left in the Jeep.  Because nothing of evidentiary value was found in the Jeep, it can be inferred that the victims' dismembered bodies by this time were in the trunk of the Buick. The [petitioner] was still with Hall and Chalue when they returned to the Dawson residence at 10:30 A.M., with Hall now driving the [petitioner]'s Jeep, and continued with them to Hall's house later that morning in the Jeep, where the [petitioner] appeared to be sleepy.

> [FN 8] Hall's statements to Casey were admissible for their truth against the [petitioner] because they were made to induce Casey's cooperation in burying the bodies and therefore were made in the course of and in furtherance of the joint venture. See Commonwealth v. Winquist, 474 Mass. 517, 522 (2016), and cases cited.

There was credible evidence that a third person participated in the killings and dismemberments with Hall and Chalue, and that the [petitioner] was the only third person with Hall and Chalue immediately before and immediately after the killings. Moreover, Hall was seen in the [petitioner]'s Jeep at or around the time period when the bodies were likely being dismembered. If the [petitioner] had not participated in the killings, it is unlikely that he would have chosen to keep

newspaper articles about the disappearance and the search for the victims in his apartment or that he would have referred to Hall in a conversation with Chalue as "our partner." In light of this evidence, a reasonable jury could have found beyond a reasonable doubt that the [petitioner] was the third person who participated in the killings and subsequent dismemberments.

Veiovis, 477 Mass. at 479-481 (citations omitted).

> **b. An evidentiary sufficiency claim governed by § 2254(d)(1) must be reviewed based on a combination of standards that together require deference to the jury and the state court.**

Challenges to sufficiency of the evidence on direct review are governed by Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Under the standard laid out in Jackson, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id.  Jackson "unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  Cavazos v. Smith, 565 U.S. 1, 7 (2011) (per curiam) (quoting Jackson, 443 U.S. at 326).

A federal court conducting habeas review of a state court's conclusion regarding the sufficiency of the evidence must employ a standard that is even more favorable to the verdict than the Jackson standard: "[A] habeas court is not to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  Morgan v. Dickhaut, 677 F.3d 39, 47 (1st Cir. 2012) (quoting Jackson, 443 U.S. at 318-19).  "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from the evidence admitted at trial," and "a state court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable."  Parker v.

Matthews, 567 U.S. 37, 43 (2012) (per curiam) (quotation and citation omitted).  "[W]e do not

ask, as we might on direct review of a conviction in federal court, whether the evidence was

constitutionally sufficient. We ask, instead, whether the state courts' ruling that the evidence is

constitutionally sufficient was itself 'unreasonable'. 'Unreasonable' in this context means that

the decision 'evinces some increment of incorrectness beyond mere error.'" Winfield v. O'Brien,

775 F.3rd 1, 8 (2014), citing United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995); Leftwich

v. Maloney, 532 F.3d 20, 23 (1st Cir. 2008); see generally Hurtado v. Tucker, 245 F.3d 7, 16 (1st

Cir. 2001).

This is a "twice-deferential standard."  Parker, 567 U.S. at 43; see Winfield 77 F.3rd at 7.

(referring to the habeas court's "second, more limited opportunity to set aside the jury's verdict"

when reviewing a state court's rejection of an evidentiary sufficiency claim); see also Linton v.

Saba, 812 F.3d 112, 123 (2016) (quoting the "twice-deferential standard" discussed in Parker).

"In practice, Jackson challenges are rarely upheld on habeas."  Brown v. O'Brien,

666 F.3d 818, 824 (1st Cir. 2012); see Sivo v. Wall, 644 F.3d 46, 50 (1st Cir. 2011) ("In practice

habeas review under Jackson . . . is reserved for unusual cases and its standard is 'rarely met

where there is plausible evidence to support a verdict.'" (quoting Tash v. Roden, 626 F.3d 15, 20

(1st Cir. 2010))); King v. MacEachern, 665 F.3d 247, 252 (1st Cir. 2011) (same).  And though

there are limits to the probative value of circumstantial evidence, "a conviction may be supported

by circumstantial evidence alone."  Morgan, 677 F.3d at 47 (quoting O'Laughlin v. O'Brien, 568

F.3d 287, 301 (1st Cir. 2009)).

The Jackson standard has been identified as enunciating a "general standard."  Foxworth

v. St. Amand, 570 F.3d 414, 429 (1st Cir. 2009) (citing Yarborough, 541 U.S. at 664; Wright v.

West, 505 U.S. 277, 308 (1992) (Kennedy, J. concurring)).  As such, habeas relief is precluded

when "it is a close question whether the state decision [on a sufficiency claim] is in error."  Id.

(citations omitted); see Magraw v. Roden, 743 F.3d 1, 5 (1st Cir. 2014) (noting that "resolving

conflicts in the evidence is customary fare for jurors"); Morgan, 677 F.3d at 48 ("[W]hen the

record is fairly susceptible to two competing scenarios, the choice between those scenarios

ordinarily is for the jury.").

### c.  The petitioner's claim fails

The SJC rejected the petitioner's claim on the merits, so its decision is entitled to review

under the rigorous standards set forth in 28 U.S.C. § 2254.  In the section of its decision where

the SJC addressed the petitioner's sufficiency of the evidence argument, the court cited a

Massachusetts case that employed a standard that is indistinguishable from the Jackson standard.

See Veiovis, 477 Mass. at 479.  ("In reviewing a claim of insufficiency of the evidence, we

determine whether, 'after viewing the evidence in the light most favorable to the prosecution,

*any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt '"(emphasis in original).  (quoting St.Hilaire , 470 Mass. at 343, which, in turn,

quoted Latimore, 378 Mass. at 677)).  The SJC's use of a quotation from Latimore confirms that

it evaluated the petitioner's sufficiency claim on the merits and under a standard that is not

contrary to Supreme Court precedent.  See, e.g., Foxworth, 570 F.3d at 424-26 (observing that

"the sufficiency issue is essentially the same under both federal and state law and the Latimore

court transplanted the appropriate federal constitutional standard into the jurisprudence of

Massachusetts," and thus finding that claim decided by reliance on Latimore would be reviewed

under § 2254(d), and noting that no colorable "contrary to" argument was raised).[4]

---

[4] Even if this Court were to disagree, review still would be under §2254(d).  In his SJC brief, the
petitioner presented his "insufficient evidence" claim under Jackson. SA Ex. 3/ 37-38.  Because
the SJC denied relief, this Court must presume that the state court adjudicated his federal

Further, for the reasons offered below, this Court must conclude that the petitioner cannot show that the SJC's decision "involved an unreasonable application of" Jackson under § 2254(d)(1).  The petitioner argued that the prosecution did not prove beyond a reasonable doubt that he participated in a joint venture to kidnap and kill the victims. Doc. No. 22 at 36-44.  The evidence was sufficient, and the SJC's decision was consistent with Jackson.

Jackson requires a reviewing court to assess the evidence "with explicit reference to the substantive elements of the criminal offense as defined by state law."  443 U.S. at 324 n.16.  The petitioner was prosecuted under a theory of joint venture liability.  Veiovis, 477 Mass. at 473. Under state law, in order to establish the petitioner's guilt as a joint venturer, the Commonwealth had to prove, beyond a reasonable doubt, that he knowingly participated in the killing with the required intent.  Zanetti, 454 Mass. at 467-68.  As the SJC reasoned, Massachusetts law dictates that "[c]ircumstantial evidence, however, "alone may be sufficient to meet the burden of establishing guilt."  Veiovis, 477 Mass. at 480, (quoting Woods, 466 Mass. at 713).  Similarly, the First Circuit has held, "[t]he elements of the crime charged do not have to be proven with direct evidence; the government can use circumstantial evidence as long as the evidence, viewed as a whole, is sufficient to warrant a reasonable jury to conclude that the defendant is guilty beyond a reasonable doubt."  United States v. Machor, 879 F.2d 945, 948 (1st Cir. 1989); see Magraw v. Roden, 743 F.3d 1, 6 (1st Cir. 2014) (noting that "direct evidence is not necessary to sustain a conviction" and that said principle "is even more firmly established in connection with the deferential approach to state-court decision making that federal habeas review demands"); see also Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the

_____

sufficiency-of-the-evidence claim on the merits and apply the deferential, habeas standard.  See Johnson v. Williams, 568 U.S. 289, 298 (2013).

sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required.  And juries are routinely instructed that '[t]he law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.'" (citation omitted; second alteration in original) (citing Holland v. United States, 348 U.S. 121, 140 (1954), as "observing that, in criminal cases, circumstantial evidence is 'intrinsically no different from testimonial evidence'"; and quoting K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions, Criminal § 12.04 (5th ed. 2000)); Tibbs v. Florida, 457 U.S. 31, 38 n.11 (1982) (favorably quoting statement in United States v. Lincoln, 630 F.2d 1313 (8th Cir. 1980), that, for evidentiary-sufficiency purposes, "'The verdict may be based in whole or in part on circumstantial evidence.'").

Here, there was sufficient circumstantial evidence to support the guilty verdicts.  As noted by the SJC, the jury could have found the following facts, all of which taken together provide proof beyond a reasonable doubt that the [petitioner] was guilty of deliberately premeditated murder.  See Veiovis, 477 Mass. at 480-481.  "A reasonable jury could have found that the [petitioner] was aware on the Friday before the killings that Hall planned to kill Glasser in order to silence him as a witness." Id., at 480; see SA Ex. 8/183-184; 9/28, 75-78.  They also could have found that the [petitioner] "had a motive to assist Hall in killing Glasser, because he wanted to be a member of the Hells Angels chapter where Hall served as sergeant at arms, and helping Hall in the killing would curry favor with Hall and cause Hall to believe him worthy of trust." Id.; see SA Ex. 8/235-236, 244-245; 9/121; 10/110; 11/150-152; 13/142-150; 14/125, 132-134; 15/29-30.  "On Saturday evening, shortly before the victims were kidnapped and killed, the [petitioner] was with Hall and Chalue at the [petitioner]'s home when they disassembled and cleaned multiple firearms that Hall had just brought." Id.; see SA Ex. 9/35-38, 96-97.  The jury

was also warranted in finding that at approximately the time of the kidnappings and killings, the [petitioner] failed to answer two telephone calls and a text message from his girlfriend, and made no outgoing calls from his cellphone.  SA Ex. 14/117-118; 15/49-50. "As described by Hall in his conversation with Casey, Hall, Chalue, and a third assailant brought the victims to the woods in the heavy downpour of the tropical storm, killed them, and dismembered their bodies."  Id.; see SA Ex.10/109-110,119; 14/114-117.  The jury could also have reasonably inferred that "the dismemberment of the victims took a substantial period of time to accomplish and that it would have been bloody and messy work in a tropical storm. Id.; see SA Ex. 6/97; 7/17, 25-26; 9/139-140, 212; 10/28,58-59, 108-109.  It is therefore significant that Hall when Hall stopped at the Dawson residence at approximately 1:30 a.m. he was a passenger in a Jeep that reasonably could be inferred was the petitioner's. SA Ex. 9/130-133.

The jury could also have reasonably inferred that Chalue and the petitioner were still with Hall at approximately 5:30 A.M., because Hall (who didn't smoke) purchased three candy bars at the convenience store and a brand of cigars smoked by the petitioner and cigarettes smoked by Chalue. See Id.; SA Ex. 9/141-147, 229; 11/134, 137-138, 146.  "This inference grows stronger when one considers that the [petitioner]'s Jeep followed Hall when [Hall] dropped the Buick off at the Dawson residence shortly after leaving the convenience store, and that Hall immediately left in the Jeep. Id. at 480-481; see SA Ex. 11/7-10.  Because nothing of forensic (e.g., serological or biological) evidentiary value was found in the Jeep, it can be inferred that the victims' dismembered bodies by this time were in the trunk of the Buick. SA Ex.12/148-150.  This was further reinforced by evidence that, following the burial of the victims' remains, Hall had the recently-purchase Buick, whose back seat was removed and the rear area and trunk stripped to bare metal, crushed at a local junkyard. SA Ex. 8/285; 9/175-180; 10/87-92.   The

petitioner "was still with Hall and Chalue when they returned to the Dawson residence at 10:30 A.M., with Hall now driving the [petitioner]'s Jeep, and continued with them to Hall's house later that morning in the Jeep, where the [petitioner] appeared to be sleepy." Id. at 481; see SA Ex. 9/210-213, 219-219; 10/216.

"There was credible evidence that a third person participated in the killings and dismemberments with Hall and Chalue, and that the [petitioner] was the only third person with Hall and Chalue immediately before and immediately after the killings." Id. When Hall described the murders to Casey, he mentioned himself, "Davey" (Chalue) and a third person who "really enjoyed torturing and cutting them up." SA Ex.10/119. There was additional evidence that the petitioner had in his apartment weapons and tools consistent with those used in the murders and dismemberments, and a collage of anatomical drawings depicting, inter alia, dismemberments, some similar to those inflicted on the victims. SA Ex.9/40.98;10/119;12/175,186-188,191-192,194-197;13/30,32-34;53-56,60,62-67,75-79;14/21-22,41-44.[5] "Moreover, Hall was seen in the [petitioner]'s Jeep at or around the time period when the bodies were likely being dismembered." Id.; see SA Ex. 9/130-133, 141-147, 210-219, 229; 10/20-25; 11/7-10; 12/134, 137-138, 141, 201-202.

Additionally, "[i]f the [petitioner] had not participated in the killings, it is unlikely that he would have chosen to keep newspaper articles about the disappearance and the search for the victims in his apartment, or that he would have referred to Hall in a conversation with Chalue as 'our partner.'" Id.; see SA Ex. 12/189; 14/150.

---

[5] Although not specifically mentioned in the discussion of the sufficiency of the evidence in the SJC decision, the SJC decision referred to this as evidence of the Petitioner being the third person. Veiovis, 477 Mass. at 481-484.

Finally, although not specifically mentioned in the SJC decision, there was additional evidence that a pair of binoculars and a night vision scope were found in the petitioner's Jeep, and that he conducted counter-surveillance of the State Police investigators after the killings. SA Ex. 12/107-114, 139, 143-145.

The petitioner's reliance upon O'Laughlin v. O'Brien, 568 F.3d 287 (1st Cir. 2009), cert. denied, 130 S. Ct. 1142 (2010), to claim that the Commonwealth's evidence "failed to show beyond speculation that Veiovis was present during the killing or otherwise participated in the crimes", Doc. No. 22 at 44, is misplaced.  "In practice, Jackson challenges are rarely upheld on habeas and O'Laughlin is a rare exception."  Brown, 666 F.3d at 824.  O'Laughlin is inapposite because, in the present case, the evidence that the petitioner highlights as "missing" was neither central to the Commonwealth's theory of the case nor necessary to prove any of the elements of the crimes charged.[6]  Specifically, the First Circuit ruled in O'Laughlin that the Commonwealth's evidence of motive was "weak at best" and that much of the evidence actively contradicted the Commonwealth's theory. O'Laughlin, 568 F.3d at 302-04.  See Woods v. Medeiros, 465 F. Supp. 3d 1, 10-11 (D. Mass. 2020) (Distinguishing O'Laughlin because petitioner in Woods had "clear motive," circumstantial evidence was not weak, there was consciousness of guilt evidence and, unlike in O'Laughlin, much of the evidence did not contradict the Commonwealth's theory.). The Court noted that the Commonwealth had argued the defendant assaulted the victim in order to steal money, but no money was taken. O'Laughlin, 568 F.3d at 302.

---

[6] The lack of physical or forensic evidence, the absence of evidence regarding the specific location of the murders or eyewitness testimony regarding the killings were not critical to the Commonwealth's theory.  And, contrary to the petitioner's assertions, there was evidence of an incriminating admission, consciousness of guilt, and incriminating evidence at his apartment. SA Ex. 9/40,98; 11/149,191-192; 12/107-114, 143-145, 175, 182, 186-189, 191-192,194-197; 13/30, 32-34, 53-56, 60,62-67, 75-79; 14/21-22, 41-44, 117-118, 146-150; 15/49-50. "The petitioner's reading of the record is overly optimistic." Housen v. Gelb, 744 F. 3rd 221, 225 (2014).

Here, in stark contrast, the Commonwealth's evidence of the petitioner's motive – to participate in the killings and dismemberments in order to curry favor with Adam Hall and cause Hall to believe him worthy of trust – was not only strong, but also consistent with the entirety of the compelling circumstantial evidence linking the petitioner to the crimes.  'The sufficiency of the evidence in any given case must be tested against the record in that case. In performing that analysis, 'the minimum amount of evidence that the *Due Process Clause* requires . . . is purely a matter of federal law.' That law is exemplified by Jackson and, reasonably applied, Jackson leads inexorably to the conclusion that the evidence presented in the petitioner's state court trial was adequate to ground his conviction." Housen, 744 F.3d at 227 (emphasis and alteration in original),  (quoting Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) (per curiam)). "Measuring the sufficiency of the evidence in a circumstantial case is not an exact science… On review for evidentiary sufficiency, though, 'a habeas court may not freely reweigh competing inferences but must accept those reasonable inferences that are most compatible with the jury's verdict.'" Id. at 226 (citing Magraw, 743 F.3d at 5).  In light of the evidence in this case and all the reasonable inferences that could be drawn from it in favor of the Commonwealth, a reasonable jury could have reasonably concluded beyond a reasonable doubt that the petitioner was the third person who participated in the killings and subsequent dismemberments.

When this Court views the evidence and the reasonable inferences that could have been drawn from that evidence in the light most favorable to the Commonwealth and resolves any credibility issues in favor of the verdict, It should conclude that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  See Morgan, 677 F.3d at 47 (citing Jackson, 443 U.S. at 318-19).  There was sufficient evidence to support the

petitioner's conviction, and the SJC's decision was reasonable, correct, and consistent with

Jackson.

## III.    __CONCLUSION__

For the foregoing reasons, this Court should deny the petition in its entirety and enter

judgment in favor of the respondent and against the petitioner.

Respectfully submitted,

MAURA HEALEY
Attorney General


 /s/ David F. Capeless

David F. Capeless (BBO #072570)
Special Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(413) 447-5530
david.f.capeless@state.ma.us

Dated:  December 31, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the ECF system on December 15, 2020, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), including Dana Curhan, Esq., counsel for the petitioner in this matter. There are no non-registered participants involved in this case.


Dated:  December 31, 2020                     /s/ David F. Capeless
                                              David F. Capeless