UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CAIUS VEIOVIS, | ) ) ) | |
| Petitioner, | ) ) | CIVIL ACTION NO. 4:18-11632-TSH |
| v. | ) ) ) | |
| SUPERINTENDENT COLETTE GOGUEN, | ) ) ) | |
| Respondent. | ) ) | |

### ORDER AND MEMORANDUM ON PETITIONER'S PETITION FOR A WRIT OF HABEAS CORPUS (Docket No. 1)

**March 23, 2022**

**HILLMAN, D.J.**

A jury convicted petitioner Caius Veiovis of three counts of murder in the first degree, three counts of kidnapping, and three counts of witness intimidation, in connection with the killings of David Glasser, Edward Frampton, and Robert Chadwell. The prosecution's theory was that Veiovis, along with Adam Hall and David Chalue, killed Glasser to prevent Glasser from testifying against Hall at an upcoming criminal trial. When Hall, Chalue, and Veiovis arrived at Glasser's home to do so, Frampton and Chadwell were there too. Hall, Chalue, and Veiovis killed Frampton and Chadwell to silence them as well.

Following his convictions, Veiovis appealed to the Massachusetts Supreme Judicial Court ("SJC"). He argued, *inter alia*, that the evidence was insufficient to support his convictions. The SJC affirmed. *See Commonwealth v. Veiovis*, 477 Mass. 472, 474 (2017). Veiovis now petitions

for a writ of habeas corpus in accordance with 28 U.S.C. § 2254. (Docket No. 1). For the following reasons, the Court ***denies*** his petition.

## Background

The following facts are drawn from the SJC's decision affirming Veiovis's convictions, supplemented by facts from the record consistent with the SJC's findings. *See Pina v. Maloney*, 565 F.3d 48, 50 (1st Cir. 2009).

In July 2009, Hall beat Glasser with a baseball bat because Hall believed that Glasser had stolen from him. Glasser went to the police, and Hall was arrested and charged with assault and battery by means of a dangerous weapon. In July 2010, while that charge was pending, Hall attempted to discredit Glasser by framing him for kidnapping. One of Hall's friends, Nicole Brooks, falsely reported to police that Glasser had kidnapped her and shot at her while she escaped. Another of Hall's friends, Scott Langdon, planted a gun in Glasser's truck. Police eventually saw through Hall's scheme and brought additional charges against him and his friends.

In August 2011, Hall began spending time with Chalue and Veiovis. Hall was a ranking member of the Hells Angels motorcycle club. Veiovis was not a member, but he wore a vest with the club's insignia and kept a club sticker in his car (a Jeep) and apartment. In Veiovis's presence, Hall told a witness something about Veiovis "possibly getting a motorcycle and becoming a prospect for the Hells Angels."

On Friday, August 26, 2011, Hall, Chalue, Veiovis, and Katelyn Carmin were driving in Hall's car (a Buick) as Hall ranted about a person who had robbed him and "snitched" on him. Hall said he was "going to kill that motherfucker." Veiovis and Chalue assured Hall that he was going to "get him." The group eventually made their way to the Hells Angels clubhouse in Lee,

Massachusetts. As Chalue, Veiovis, and Carmin were riding all-terrain vehicles, Hall told Carmin to be careful because he needed Chalue and Veiovis for "a job."

The following morning, Saturday, August 27, 2011, Hall was seen speaking with Veiovis outside of Veiovis's girlfriend's apartment. In the early afternoon, Hall, Chalue, and Veiovis went to a Hells Angels party in Springfield, Massachusetts. Hall and Veiovis left together and returned around 4:30 P.M. Hall, Chalue, and Veiovis left together at 6:30 P.M.

That evening, Hall, Chalue, and Veiovis met Allyson Scace and Kayla Sewell at the Hells Angels clubhouse before going to Veiovis's apartment in Pittsfield, Massachusetts. Chalue, Veiovis, Scace, and Sewell drove to Pittsfield in Scace's car. Hall drove separately, stopping at Steven Hinman's house on the way. Hall showed Hinman a .45 semiautomatic pistol in his vest, as well as a "dog food bag" that contained a .44 Magnum revolver, a sawed-off AR-15-type weapon, and a small revolver. When Hall arrived at Veiovis's apartment, Hall pulled the guns out of the bag and asked Veiovis where he kept brake cleaner and gloves. Veiovis directed him to a cabinet and went upstairs with Sewell. While Veiovis and Sewell were upstairs, Hall and Chalue disassembled and cleaned the guns. Although Veiovis asked Sewell to stay longer, Sewell and Scace left Veiovis's apartment around 9 P.M.

Glasser, Frampton, and Chadwell also lived in Pittsfield. Around 10:30 P.M., Glasser's upstairs neighbor asked Glasser to move his truck, which was in the shared driveway of their building. The upstairs neighbor saw Glasser, Frampton, Chadwell, and a fourth man in Glasser's apartment. At 11:21 P.M., a call was made from Chadwell's cell phone. Shortly after midnight, the upstairs neighbor heard banging from the front downstairs hallway. She could hear Glasser's voice, Frampton's voice, and some unfamiliar voices.

Early Sunday morning, Veiovis's girlfriend tried to contact Veiovis on his cell phone. She called and left a message at 12:09 A.M.; she texted at 1:20 A.M.; and she called and left another message at 1:40 A.M. Veiovis did not respond.

Around 1:30 A.M., Hall appeared at Rose Dawson's house in Pittsfield. Hall borrowed Dawson's cell phone and said that he would be back soon. Hall got into a vehicle described as a Jeep Wrangler and left. One witness described the Jeep as yellow; another witness described the Jeep as green. Veiovis owned a black Jeep Wrangler.

Around 5:30 A.M., Hall purchased three candy bars and a pack of cigarettes from a convenience store in Pittsfield. Hall had mud on his shirt, and his boots and jeans were wet, as was the cash he used to pay for the items. A tropical storm had hit western Massachusetts that night. Hall left the convenience store and returned a few minutes later to purchase a pack of Black and Mild cigars. Police later found Black and Mild cigar wrappers in Veiovis's apartment and Jeep.

Shortly thereafter, Hall returned to Dawson's house and parked his Buick on the front lawn. Hall got out of the Buick and walked to Veiovis's Jeep, which was waiting out in the road. Hall got into the passenger side of the Jeep, and the Jeep drove off.

Around 10:30 A.M., Hall returned to Dawson's house in Veiovis's Jeep with Chalue and Veiovis; Hall was driving. Hall was wet and not wearing shoes. Hall asked Dawson and another friend, Alexandra Ely, who was staying at Dawson's house, to go to Hall's house in Peru, Massachusetts to make breakfast. He gave them money, which was soaking wet, and told them to wash their hands after handling it. He also told them to buy bleach and not to touch or look inside a bag on the passenger-side floor of the Buick. Taking the Buick to get food and to go to Peru, the women looked inside the bag and saw what looked like a "batting glove or golf glove."

4

When Dawson and Ely arrived at Hall's house, Chalue was in bed, and Veiovis was sitting in a recliner "sleeping" and looking "tired." Hall was "exited" and "jumpy." Hall returned Dawson's cell phone to her, telling her to delete the call log and not to tell anyone that he had borrowed it. Dawson and Ely left in the Buick to return to Dawson's house. Hall, Chalue, and Veiovis retrieved the Buick from Dawson's house later that day.

Around 2 P.M., Hall arrived at David Casey's house in Canaan, New York, which is approximately eighteen miles from Pittsfield. Hall told Casey that he was looking for a spot to park his car overnight. Casey arranged for Hall to park at Al Pavoni's house in Becket, Massachusetts.

Hall then told Casey that he had killed Glasser, "a fat guy," and a black man. In recounting the killings, Hall described that Glasser took off into the woods. Hall "told one of the other guys to go after him." After "Davey" did so and brought Glasser back, Hall shot Glasser. They "chopped them up," and "one of the guys really enjoyed torturing and cutting them up." It was "raining very hard" while this was happening.

Hall asked Casey if he was still working with an excavator at a property in Becket, and Casey said that he was. Hall told Casey that if he dug a hole for him to bury the bodies, he would not harm Langdon, who was engaged to and living with Casey's sister. Casey also knew that Langdon was cooperating with police regarding Hall's criminal charges. Hall wanted to dig the hole that day, but Casey worried that the property owner in Becket might be home, so he suggested waiting a day. Casey said he would meet Hall at the property on Monday morning.

Hall parked the Buick at Pavoni's house in Becket between 5 P.M. and 6 P.M. Someone was with Hall in the Buick. A "Jeep-like vehicle" arrived to pick Hall up. Late in the afternoon,

5

Hall, Chalue, and Veiovis were seen standing near Veiovis's Jeep in the parking lot of Veiovis's girlfriend's apartment in Pittsfield.

On Monday morning, Hall and Casey met at Pavoni's house. Hall was with a man he called "Davey." Hall told Casey he could trust "Davey" because he was a member of the Aryan Brotherhood, and a person had to kill someone to become a member. At trial, Casey identified the man as Chalue. Hall opened the trunk of the Buick and said that it was "starting to smell." Hall drove the Buick to the other property in Becket, where Casey used his excavator to dig a large hole. Hall took a number of large plastic garbage bags from the Buick and dropped them into the hole.

That afternoon, Hall and Chalue brought the Buick to a salvage yard and sold it for scrap. The interior carpets were coated with liquid, the back seat was mostly missing, and the carpet had been removed from the trunk. The car was later crushed.

On Sunday, September 4, Hall, Chalue, and Veiovis drove past the salvage yard in Veiovis's Jeep, and then drove back in the other direction. Police stopped the Jeep at a nearby gas station; they seized and searched the Jeep but found nothing of evidentiary value.

On Friday, September 9, Casey told police the location of the bodies. Police uncovered the bodies, which were confirmed to be those of Glasser, Frampton, and Chadwell. An autopsy revealed that all three victims had been shot and stabbed, and that their neck, arms, and legs had been removed. Two of the bodies also had been cut through the torso. The dismemberment was largely the result of chopping or hacking with a sharp instrument such as a butcher knife.

On September 10, Veiovis was arrested. At the Pittsfield police station, an officer told Veiovis that Hall was a "rat" because Hall had offered to cooperate with the FBI regarding the

Hells Angels.  As Veiovis was walking back to his cell, he said to Chalue, "[Y]ou hear what they're saying about our partner?  They're saying he's a stoolie."

On September 12, police searched Veiovis's apartment.  They found two newspaper articles describing the disappearance of Glasser, Frampton, and Chadwell.  They also found anatomical drawings from a medical textbook with images of human dissections and amputation of body parts.  They further found a machete, a cleaver, hatchets, various knives, and a baseball bat with spikes.  None of the items tested positive for blood, so they were not seized.

Veiovis was charged with three counts of murder, three counts of kidnapping, and three counts of witness intimidation.[1]  A jury found him guilty on all counts.[2]  As to murder, the jury found him guilty on a theory of deliberate premeditation.  Veiovis appealed.  He argued, *inter alia*, that the evidence was insufficient to support his convictions.  The SJC affirmed.[3]  Veiovis subsequently petitioned for habeas relief.  He argues that his convictions violate his right to due process because they are based on insufficient evidence.

## Standard of Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court shall not grant a petition for habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court proceedings "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based

---

[1] Hall and Chalue also were charged.  Each defendant was tried separately.

[2] Juries also convicted Hall and Chalue of three counts of murder in the first degree.

[3] Two judges dissented, disagreeing with the majority's analysis of an evidentiary issue. The dissenting judges agreed, however, that the evidence was legally sufficient to support Veiovis's convictions.  *See Veiovis*, 78 N.E.3d at 774.

7

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

### Discussion

Veiovis asserts one ground for habeas relief: that the evidence presented at his trial was legally insufficient to support his convictions. Veiovis focuses specifically on his murder convictions. The federal constitutional standard for measuring the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The prosecution proceeded on a theory of joint venture liability. "At its core, joint venture criminal liability has two essential elements: that the defendant knowingly participated in the commission of the crime charged, and that the defendant had or shared the required criminal intent." *Commonwealth v. Zanetti*, 454 Mass. 449, 467 (2009). Veiovis was convicted of deliberately premeditated murder, the elements of which are that the defendant caused the death of the victims, intended to kill the victims, and acted with deliberate premeditation. *Commonwealth v. Tejada*, 484 Mass. 1, 4 (2020).

The SJC applied the correct standard. The SJC sought to determine whether, "after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Veiovis*, 477 Mass. at 479 (citing *Commonwealth v. St. Hilaire*, 470 Mass. 338, 343 (2015) (emphasis in original)). "The SJC relied on Massachusetts case law that has expressly adopted the federal constitutional standard in *Jackson*." *O'Laughlin v. O'Brien*, 568 F.3d 287, 299 n.15 (1st Cir. 2009).

The SJC's application of the law was not unreasonable. In the SJC's view, the evidence suggested that Veiovis had knowledge of Hall's plan to kill Glasser and a motive to assist Glasser

in the killing. *Veiovis*, 477 Mass. at 480. Veiovis "did not dispute that there was abundant evidence that Hall and Chalue participated in the killings," and there was "credible evidence" that a third person participated in the killings with them. *Id.* at 474, 481. The evidence put Veiovis with Hall and Chalue immediately before and immediately after the killings. *Id.* at 480-81. Had Veiovis not participated in the killings, moreover, it is unlikely that Veiovis would have referred to Hall as "our partner" in a comment to Chalue or kept newspaper articles mentioning the victims' disappearance. *Id.* at 481. The SJC concluded that "the evidence was sufficient to support a finding beyond a reasonable doubt that [Veiovis], with the intent to kill, knowingly participated in the premeditated murder of the three victims." *Id.* at 480 (citing *Zanetti*, 454 Mass. at 467).

Veiovis contends that the SJC misapplied the *Jackson* standard and allowed his convictions to stand on less than proof beyond a reasonable doubt. Veiovis notes that no physical or forensic evidence connected him to the crimes; that the murder scene was never found; that no evidence linked him to the burial scene; and that there was no percipient witness to the crimes. He argues that the only link between him and the crimes was his association with Hall and Chalue before and after the killings. The evidence against Veiovis was entirely circumstantial, as the SJC acknowledged. *Id.* at 480. But circumstantial evidence alone may be sufficient to establish guilt beyond a reasonable doubt. *See Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012).

Veiovis understates the circumstantial evidence against him. *See Housen v. Gelb*, 744 F.3d 221, 225 (1st Cir. 2014). As the SJC noted, a jury reasonably could have inferred that Veiovis had knowledge of Hall's plan to kill Glasser. On the Friday before the killings, Veiovis was driving with Hall and others when Hall, referring to Glasser, said he was "going to kill that motherfucker." Veiovis assured Hall that Hall was going to "get him." A reasonable jury also could have inferred that Veiovis wanted to curry favor with Hall. Veiovis had a demonstrated interest in the Hells

9

Angels, and Hall was a ranking member of the Hells Angels. Hall apparently saw Chalue as trustworthy; Hall told Casey that Casey could "trust" Chalue because Chalue was "an Aryan brother," and "you [have] to kill someone to get in." A reasonable jury could have inferred that Veiovis similarly wanted to gain Hall's trust, and that Veiovis believed that assisting Hall in the killings was one way to do so.

A reasonable jury could have inferred that the killings occurred early Sunday morning. Glasser's upstairs neighbor last saw the victims at around 10:30 P.M. on Saturday night, and she heard banging and voices shortly after midnight. The SJC noted that there was "credible evidence" that a third person participated in the killings with Hall and Chalue. *Veiovis*, 477 Mass. at 481. Indeed, when Hall described the killings to Casey, Hall at times mentioned "one of the other guys" and "one of the guys," suggesting that at least two people were with him. At 5:30 A.M. on Sunday morning, moreover, Hall bought three candy bars from a convenience store, cigarettes, and a brand of cigars smoked by Veiovis.

Veiovis was with Hall and Chalue at least as of 9 P.M. on Saturday night, when Scace and Sewell left the three men in Veiovis's apartment. Between midnight and 2 A.M., Veiovis's girlfriend tried contacting Veiovis's cell phone three times; Veiovis did not respond. At 1:30 A.M., Hall arrived at Dawson's house in a Jeep. A reasonable jury could have inferred that it was Veiovis's Jeep, and that Veiovis was in it. Soon after 5 A.M., Hall arrived at Dawson's house, followed by Veiovis's Jeep. Hall left in Veiovis's Jeep and later returned with Chalue and Veiovis. That morning at Hall's house, Veiovis appeared to be tired. A reasonable jury could have inferred that Veiovis was with Hall and Chalue when the victims were killed, or in other words, that Veiovis was "one of the other guys."

Finally, Veiovis's actions after the killing -- his collection of two articles on the victims' disappearance, and his comment to Chalue that Hall was their "partner" -- were probative of his involvement in the killings. The facts recited above, when taken together, support a finding of guilt beyond a reasonable doubt. Hall admitted to Casey that he had killed the victims; Hall implicated Chalue and a third assailant. The SJC's conclusion that, viewing the evidence in the light most favorable to the prosecution, Veiovis could have been found to be that third assailant beyond a reasonable doubt was not unreasonable.[4]

Veiovis next argues that while Casey referred to a third assailant, Casey did not identify Veiovis, and the only name Casey mentioned other than "Davey" was "Langdon." Veiovis asserts that this renders his involvement in the killings speculative. At trial, when the prosecutor asked Casey whether he remembered Hall making a comment "relative to a third person that was with him . . . making some comment about somebody else who was involved," Casey responded, "Langdon?" The prosecutor then said, "No. In talking about the -- when he was . . . talking about the killing . . . do you remember him talking about another guy, the way that guy acted?" The prosecutor then showed Casey something to refresh his memory, at which point Casey recounted that Hall had said "that one of the guys really enjoyed torturing and cutting them up." Later, Casey testified that Hall told him that he would not harm Langdon, who was engaged to and living with Casey's sister, if Casey helped him bury the bodies.

The SJC did not mention Casey's "Langdon" comment in its decision, although the SJC did explain Casey's connection to Langdon, and Hall's comment that no harm would come to Langdon if Casey helped bury the bodies. Casey's testimony reasonably can be read as not

---

[4] The circumstantial evidence here is more compelling than the circumstantial evidence in *O'Laughlin v. O'Brien*, 568 F.3d 287 (1st Cir. 2009).

11

implicating Langdon in the killings, and the SJC's recitation of the facts suggests an implicit understanding of that reading. *See Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007). In any event, even if Casey's testimony can be understood to implicate Langdon in some way, the "Langdon" comment does not exculpate Veiovis in a way that renders unsupported a finding that Veiovis knowingly and intentionally participated in the killings.

Veiovis last argues that the SJC overlooked several significant facts suggesting that he was not the third accomplice. First, Veiovis was not involved in Hall's previous schemes to discredit Glasser. Second, while Hall and Chalue were cleaning guns in Veiovis's apartment on Saturday night, Veiovis was upstairs with Sewell. Third, while witnesses described Hall as wet early on Sunday morning, no one described Veiovis as wet. Fourth, unlike Hall and Chalue, Veiovis did not dispose of any evidence after the killings. Fifth, Veiovis's "our partner" comment to Chalue could have been about the three men being arrested together or friends. Sixth, Hall's statement to Carmin that he needed Veiovis for "a job" could have been about a construction project at Hall's house. Finally, even if Veiovis wanted to join the Hells Angels, the prosecution presented no evidence to suggest that killing three people would have advanced his membership in the club.

Veiovis reasonably explains why, contrary to the prosecution's theory, some of the evidence presented at trial might not have implicated him in the crimes. But the standard for measuring the sufficiency of the evidence, as applied by the SJC and required by the federal constitution, requires viewing the evidence <u>in the light most favorable to the prosecution</u>. *Jackson*, 443 U.S. at 319. And here, the SJC explicitly considered that Hall and Chalue cleaned guns at Veiovis's apartment, that Veiovis appeared tired on Sunday morning, that Veiovis referred to Hall as "our partner," and that Veiovis wanted to join the Hells Angles. The SJC reasonably concluded that a jury could have drawn reasonable inferences from this evidence implicating Veiovis in the

killings.  Even if some evidence was neutral or pointed the other way, it was not unreasonable for the SJC to determine that a jury could have found Veiovis guilty of first-degree murder beyond a reasonable doubt.  Accordingly, Veiovis's petition for a writ of habeas corpus must be denied.

## Conclusion

For the reasons stated, Veiovis's petition for a writ of habeas corpus is ***denied***, and the case will be dismissed.

## **Certificate of Appealability**

The statute governing appeals of final orders in habeas proceedings provides that an appeal is not permitted "[u]nless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a "substantial showing," a petitioner must demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). This is a low bar; a claim can be considered "debatable" even if every reasonable jurist would agree that the petitioner will not prevail. *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).

Given the circumstantial nature of this case, reasonable jurists could debate the significance of various aspects of the trial record, on which Veiovis's insufficiency of the evidence claim depends. Accordingly, the Court grants a certificate of appealability.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**